IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION.

### JACKSON, APRIL TERM, 1910.

GEORGE M. CLARK *et al. v.* MEMPHIS STREET RAILWAY
COMPANY *et al.*

*(Jackson.* April Term, 1910.)

1. FOREIGN CORPORATIONS. State may restrain their exer-
cise of powers contrary to statute, court decisions, good
morals, and public policy.

Any power attempted to be exercised by a foreign corporation un-
der the grant of its charter, or under a foreign statute, that
violates a statute of the State, or of the United States, or that
is contrary to the settled decisions of the highest court of the
State, or that is contrary to good morals, is against public
policy, and the State may restrain the exercise of such power.
(*Post, pp.* 239, 240.)

Case cited and aproved: Thornburg v. Harris, 3 Cold., 157, 172.
See citations under headnote 2.

2. SAME. May exercise powers where statutes, court decisions,
and executive practice are silent, if not against public policy
and good morals; sources of public policy.

The statutes of the State, or of the United States, and the settled
decisions of the highest court of the State are the sources from
which public policy must be learned, along with the practice

Clark v. Railroad.

of the executive departments of the State government; and mere silence in the statutes and decisions, as to any certain power of corporations, may be sufficient to indicate that the matter is not against public policy, where it is not against public morals, so that a foreign corporation may act in such matter, or exercise such power. (*Post, p.* 240.)

Cases cited and approved: License Tax Cases, 5 Wall., 469; Cowell v. Colorado Springs Co., 100 U. S., 59; United States v. Freight Association, 166 U. S., 840; St. Louis Mining Co. v. Montana Mining Co., 171 U. S., 655; Insurance Co. v. Railroad, 70 Fed., 201; Thompson v. Waters, 25 Mich., 223; Floyd v. Loan & Investment Co., 49 W. Va., 334.

3. SAME. Recognized by comity; and they may do any act, within their charter powers, not prohibited in another State.

By comity the existence of a corporation in the State where it is created and resides is recognized in foreign States, like a natural person, and it may make any contract, or do any act in a foreign State, within its charter powers not prohibited by the foreign State, either in its direct enactments, or by its public policy, to be deduced from the general course of legislation, or from the settled adjudications of its highest court. (*Post, pp.* 240-245.)

Cases cited and approved: Insurance & Trust Co. v. Insurance & Trust Co., 11 Hum., 1, 25; Talmadge v. Coal & Transportation Co., 3 Head, 341; Whitlow v. Railroad, 114 Tenn., 357; Bank v. Earle, 13 Pet., 521; Cowell v. Colorado Springs Co., 100 U. S., 55; Christian Union v. Yount, 101 U. S., 356.

4. CORPORATIONS. In the absence of express or implied power, one cannot purchase stock in another.

The rule in this State is, as is held by the weight of authority over the whole country, that in the absence of express power conferred by the charter of a corporation, or otherwise by legislation, or by necessary implication, one corporation has no power to buy or subscribe for shares of stock in another corporation. (*Post, pp.* 245-252.)

Clark v. Railroad.

Code cited and construed: Secs. 1520, 2339, 2436 (S.); secs. 1262, 1860 (M. & V.); sec. 1140b (T. & S.).

Acts cited and construed: Acts 1869-70 (Private), ch. 49, sec. 4.

Cases cited and approved: Nichol v. Nashville, 9 Humph., 257; Deaderick v. Wilson, 8 Bax., 108; Marble Co. v. Harvey, 92 Tenn., 115; Miller v. Insurance Co., 92 Tenn., 167; Coal Co. v. Coal Co., 106 Tenn., 651; Rogers v. Railroad, 91 Fed., 299, and 33 C. C. A., 517.

5. FOREIGN CORPORATIONS. May purchase and hold stock in corporations in this State, when so authorized by charter.
A foreign corporation, expressly authorized by its charter, or by the statutes of the State of its creation, to purchase and hold stock in other corporations, may purchase and hold the stock of street railroad corporations in this State, and such purchase is not contrary to public policy as evidence by the statutes and decisions of the supreme court of the State. (Post, pp. 237-239, 252, 253.)

6. SAME. Same. But such purchase is illegal, if it creates a monopoly, unlawful restraint of trade, or suppression of competition.
A foreign corporation, expressly empowered by its charter, or by the statutes of the State of its creation, to purchase and hold stock in other corporations, may purchase and hold the majority of the stock in another corporation in this State; and our courts, in the absence of legislation on the subject, cannot hold that the purchase was illegal, except in so far as monopoly might thereby be created in the line of business of such corporation, or in so far as there might be an unlawful restraint of trade, or suppression of competition between rival corporations and businesses. (Post, pp. 237-239, 252, 253.)

7. SAME. Statute declares public policy of this State, when dealing with the power which may be exercised by any foreign corporation admitted to this State.

Clark v. Railroad.

Our statute (Shannon's Code, sec. 2559), providing that where the charter of a foreign corporation, or any part thereof, filed in the office of the secretary of State, shall be in contravention or violation of the laws of this State, all such parts thereof as may be found to be in conflict with the laws of this State shall be null and void, declares the public policy of this State, when dealing with the power which may be exercised by any foreign corporation admitted to this State. (*Post, p.* 253.)

Code cited and construed:  Sec. 2559 (S.); sec. 2003 (M. & V.).

8. **SAME.   May purphase stock in several other noncompeting corporations, without effecting a consolidation, or affecting their rights.**

A foreign corporation, expressly empowered by its charter, or by the statutes of the State of its creation, to purchase and hold stock in other corporations, may purchase and hold a majority of the stock in several street railway corporations operating street railways in widely separated cities, without any physical connection or common interest, and such purchase and holding of such stock does not create a consolidation of the corporations, because of the absence of a union of corporate interests and stockholders, for the foreign corporation becomes merely a stockholder, and the rights of the several corporations, as such, remain unchanged.  (*Post, pp.* 253, 254.)

Case cited and approved:  Pullman Car Co. v. Missouri Pacific Railway Co., 115 U. S., 596, 597.

9. **CORPORATIONS.   Manipulation and suits by holding corporation to buy in stock will be enjoined, when.**

Manipulation of the control of a corporation by a holding corporation, which has a majority of its stock, so as to enable it to buy in the remaining stock at an inadequate price, will not be countenanced by equity; and the bringing of needless suits to waste the property of the corporation and destroy its business, with the object of procuring a monopoly for the holding corporation, warrants an injunction at the instance of any stockholder.  (*Post, pp.* 254, 255.)

Clark v. Railroad.

10. **SAME.** Holding corporation may vote as stockholders, receive dividends, and exercise privileges as a natural person; but must not defraud minority stockholders, nor prevent performance of public duties.

A corporation authorized to acquire stock of other corporations may acquire the permanent ownership of stock in another corporation, and may issue its own stock therefor, and may vote at all meetings of stockholders, receive dividends, and exercise the privileges of a natural person; but its control must not defraud the rights of minority stockholders, nor prevent the corporation whose stock is purchased from performing its public duties imposed by its charter. (*Post, pp.* 255, 256.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby County. F. H. HEISKELL, Chancellor.

TURLEY & TURLEY and WM. JARVIS, for complainants.

WRIGHT & WRIGHT and J. C. BRADFORD, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

Stated in the briefest and most general terms, this bill was filed chiefly to set aside a purchase by the American Cities Railway & Light Company (hereinafter called the "American Company") of the majority of stock of the Memphis Street Railway Company, whereby the American Company acquired a controlling interest in

the latter company. A secondary purpose was to hold Isadore Newman & Son liable for a loss alleged to have been caused to the Memphis Street Railway Company by what is charged to have been a fraudulent purchase of $1,500,000 of bonds of the latter company. The chancellor refused relief upon both aspects of the bill, and thereupon the complainants appealed to this court and have here assigned errors.

The complainants are citizens of Louisville, Ky., and own 175 shares of the common stock (par value $100) of the Memphis Street Railway Company out of an aggregate of $5,000,000 capital stock, one-half preferred and one-half common.

The occasion of their filing the bill was the consummation of a proposition which the American Company made, respectively, to the stockholders of the Memphis Street Railway Company, and the stockholders of the Birmingham Railway, Light & Power Company, located at Birmingham, Ala., the Little Rock Railway & Electric Company, located at Little Rock, Ark., Knoxville Railway & Light Company, Knoxville, Tenn., and Houston Lighting & Power Company, Houston, Texas, for the purpose of the majority of stock in each company. The stockholders holding a majority in interest of the stock of each of these companies transferred their shares to the American Company, in exchange for an equivalent in value in the shares of that company. None of the companies mentioned are parties to the present proceeding except the Memphis Street Railway Company.

After the purchase by the American Company of the majority of the stock of the Memphis Street Railway Company, the business of that company proceeded without interruption, and in the accustomed way, being governed by the board of directors; the only apparent difference being that the American Company had the controlling vote in the election of the new board of directors. There does not, however, seem to have been any change in the personnel of the board.

The American Company is a New Jersey corporation —an investment company—having, by the terms of its charter, power:

"(1)   To acquire by purchase, subscription or otherwise, and to hold as investment or otherwise, any bonds or other securities or evidences of indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, district, territory or country.

"(2)   To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, district, territory or country; and while the owner thereof, to exercise all the rights, powers and privileges of ownership.

"(3)   To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capi-

tal stock of any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, district, territory, or county; and while the owner of such stock, to exercise all the rights, powers and privileges of ownership, including the right to vote thereon.

"(4)   To aid in any lawful manner any corporation or association of which the bonds, or other securities or evidences of indebtedness, or stock, are held by the company; and to do any and all lawful acts or things designed to protect, preserve, improve or enhance the value of any such bonds, or other securities, or evidences of indebtedness, or stock.

"(5)   To guarantee dividends on any shares of the capital stock of any corporation in which this company at the time may have an interest as stockholder, and to endorse or otherwise guarantee the principal and interest of notes, bonds or other evidences of indebtedness, created or to be created by any such corporation"—and various other powers not necessary to specially mention here.

It is perceived that express power is given to purchase and own shares of stock in other corporations, and to vote on the same, whether the latter corporation be a New Jersey corporation, or that of some other State or country.

It is insisted that the exercise of such a power by a foreign corporation in this State is contrary to the public policy of the State. Anything that is *contra bonos*

*mores* is against public policy. *Thornburg* v. *Harris,* 3 Cold., 157, 172. This case does not fall under that head. Any power attempted to be exercised under a foreign statute or charter that violates a statute of the State, where it is sought to be used, or of the United States, or that is contrary to the settled decisions of the highest court of the State, is against public policy. These are the sources from which public policy must be learned, along with the practice of the executive departments of the State government. Mere silence upon the subject in statutes or decisions may be sufficient to indicate that the matter is not against public policy where it is not against good morals. *United States* v. *Freight Association,* 166 U. S., 340, 17 Sup. Ct., 540, 41 L. Ed., 1007; *St. Louis Mining Co.* v. *Montana Mining Co.,* 171 U. S., 655, 19 Sup. Ct., 61, 43 L. Ed., 320; *License Tax Cases,* 5 Wall., 469, 18 L. Ed., 497; *Cowell* v. *Colorado Springs Co.,* 100 U. S., 59, 25 L. Ed., 547; *Hartford Insurance Co.* v. *Chicago M. & P. Ry. Co.,* 70 Fed., 201, 17 C. C. A., 64, 30 L. R. A., 193; *Thompson* v. *Waters,* 25 Mich., 223, 12 Am. Rep., 243; *Floyd* v. *National Loan & Investment Co.,* 49 W. Va., 334, 38 S. E., 653, 54 L. R. A., 536, 87 Am. St. Rep., 805. It is not against the policy of this State, or indeed of any of the States of the Union, so far as we are advised, for a foreign corporation to do business in the State, though in most of them there are regulations and restrictions. By the law of comity, the existence of a corporation in the State where it is

created and resides is recognized in foreign States, like a natural person, and it may make any contract or do any act in a foreign State, within its charter powers, which is not prohibited by the foreign State. *Ohio Life Insurance & Trust Co.* v. *Merchants' Insurance & Trust Co.*, 11 Humph., 1, 25, 53 Am. Dec., 742; *Talmadge* v. *North American Coal & Transportation Co.*, 3 Head., 341; *Whitlow* v. *N. C. & St. L. R. Co.*, 114 Tenn., 357, 84 S. W., 618, 68 L. R. A., 503; *Bank of Augusta* v. *Earle*, 13 Pet., 521, 10 L. Ed., 274; *Cowell* v. *Colorado Springs Co.*, 100 U. S., 55, 25 L. Ed., 547; *Christian Union* v. *Yount*, 101 U. S., 356, 25 L. Ed., 888. "In harmony with the general law of comity obtaining among the States comprising the Union, the presumption should be indulged that a corporation of one State, not forbidden by the law of its being, may exercise within any other State the general powers conferred by its own charter, unless it is prohibited from so doing, either in the direct enactments of the latter State, or by its public policy, to be deduced from the general course of legislation, or from the settled adjudication of its highest court." Morawetz on Corporations (2d Ed.), sec. 960. In Murfree on Foreign Corporations it is said: It is "a principle of the law of nations that, in the absence of any positive rule affirming, denying, or restraining the operation of foreign laws, courts will, through comity, presume the tacit adoption of them by their own government, unless repugnant to its own policy and interests. By an application of this rule, the

legal existence and corporate capacity of foreign companies are now universally recognized." Id., sec. 2. To the same effect: 6 Thompson on Corporations, secs. 7882, 7884; Beale on Foreign Corporations, secs. 108, 113. In *Thompson* v. *Waters,* supra, it is said: "And, in ascertaining what this legislative policy is, we are to be guided not only by such express provisions as they have chosen to make, but also by their silence, which may furnish as clear an indication of what that policy was intended to be as can be drawn from what they have expressed; since if they have made no provision at all upon the particular subject, or branch of the subject, or the question involved, it may be reasonably inferred that they intended to adopt, and left to the courts to apply, the generally received principles of comity, and to that extent to adopt the foreign law, or rather recognize the rights dependent on such laws, and, if they have chosen to leave the matter without any legislative provision, the case must be a very clear one, indeed, which would authorize the courts to refuse such recognition on the ground that it would be prejudicial to the interests of the State; since the legislature are the proper representatives of the public interests and having the exclusive power to determine what shall be the public policy of the State, if they have chosen to make no enactment upon the subject, it is natural to infer that they have omitted to do so because they thought it unnecessary, and that the generally recognized principles would be sufficient for such cases."

As to the special power to subscribe for or buy stock in other corporations, the following authorities are in point: In Noyes on Intercorporate Relations, sec. 271, it is said: "The statutes of the different States authorizing corporations to take stock in other corporations are collected in the footnote. The effect of these statutes is to enlarge the powers of the corporations to which they apply. There is nothing in the nature of a corporation which renders it incapable of holding stock in other corporations, and questions of public policy are determined by the legislature in granting the power." In section 286: "The right of a corporation of one State to subscribe for or acquire shares of stock in a corporation of another State depends, primarily, upon the extent of its chartered powers, and the laws of the State of its incorporation. If it is without the power in the State of its creation, it is without the power everywhere. A corporation having power to subscribe for stock in other corporations may exercise the power in another State if the laws of that State permit. . . . Where stock has been lawfully acquired by a foreign corporation it has all the rights and powers, and is subject to all the liabilities, of other stockholders." In 4 Thompson on Corporations (2d Ed.), sec. 4058, it is said: "The rule of the foregoing sections only means that a corporation has no power to subscribe for or purchase and hold the stock of another corporation, unless such power is expressly given, or unless it is clearly implied from powers conferred. It is very clear that

one corporation may under certain circumstances either
subscribe for or take and hold the stock of another cor-
poration. These circumstances are now to be consid-
ered. In the first place, a corporation may be expressly
authorized either to subscribe for or take and hold
shares of stock in another corporation, etc. . . . .
But it was said that, in the absence of any constitu-
tional provision on the subject, the legislature could
confer such power upon corporations; that the only
limitation on the power of the corporation involved in
the case was that it could not exercise such power for
the purpose of creating a monopoly or defeating compe-
tition to the injury of the public; that otherwise it had
power to purchase stock of another corporation." To
the same effect, see sections 650 and 651 of the same
work. As said in section 60 of 1 Mechem on Corpora-
tions: "Of course, in any particular case, the owner-
ship of shares of stock by a corporation may be unlawful
because of some ulterior illegal intent, such as the cre-
ation of a monopoly, restraint of trade, or the practical
consolidation of competing lines of railway in fraud of
some prohibitory statute, or in violation of what may be
deemed the public policy of the State." The case of
*Northern Securities Company* v. *United States,* 193 U.
S., 197, 24 Sup. Ct., 436, 48 L. Ed., 679, is an illustra-
tion of the exception. In that case it appeared and was
held that the Northern Securities Company was organ-
ized for the purpose of holding the stock of two com-
peting railway lines, so as to place them practically

under one management, and so stifle competition be-
tween them, and its operations in that regard were re-
strained and prevented by a proper decree of the court.
And see the closing of that controversy in *Harriman* v.
*Northern Securities Company,* 197 U. S., 244, 25 Sup.
Ct., 493, 49 L. Ed., 739.

In Tennessee the rule is, as is held by the weight of
authority over the whole country, that in the absence
of express power conferred by the charter, or otherwise
by legislation, or by necessary implication, one corpo-
ration has no power to subscribe for or buy shares of
stock in another corporation. See *Marble Company* v.
*Harvey,* 92 Tenn., 115, 20 S. W., 427, 18 L. R. A., 252,
36 Am. St. Rep., 71, as construed and applied in *Miller*
v. *Insurance Company,* 92 Tenn., 167, 21 S. W., 39, 20
L. R. A., 765; *Coal Company* v. *Coal Company,* 106
Tenn., 651, 62 S. W., 162, and by Lurton, J. (who deliv-
ered the opinion in *Marble Company* v. *Harvey*), in the
case of *Rogers* v. *N., C. & St. L. R. Co.,* 91 Fed., 299, 33
C. C. A., 517. There are some general expressions in
*Marble Company* v. *Harvey* that indicate a contrary
view; but they must be understood in relation to the
case the court was dealing with; that is, one in which
it appeared that no express power was given in the char-
ter of the Marble Company to purchase stock in other
corporations. They must also be understood as limited
and explained in the subsequent decisions.

It is not true as a general proposition that the pur-
chase of shares of stock in one corporation by another is
against the public policy of this State, where such power

is expressly conferred by the charter of the acquiring corporation, as this public policy is evidenced by the statutes and decisions of this State. As far back as 1845 power was given in the charter of the Nashville & Chattanooga Railroad Company to other corporations to take stock in that company. *Nichol* v. *Mayor of Nashville,* 9 Humph ., 257. Under Shannon's Code, section 1520 (Priv. Acts 1869-70, c. 49, section 4), power was given to the railroads of the State, under certain circumstances therein stated, to buy stock in other roads. Under section 2436 of Shannon's Code, power is given to railroad companies to purchase stock in a certain character of terminal companies. By section 2339, mining companies are permitted to purchase and hold stock in railway companies contiguous to the works. In the case of *Rogers* v. *N. C. & St. L. R. Co.,* supra, there was drawn in question the right of the Louisville & Nashville Railroad Company to vote stock in the Nashville, Chattanooga & St. Louis Railroad Company which it had acquired under a power conferred upon it by its charter; it being a Kentucky corporation. A bill in equity was filed by the minority stockholders of the Nashville & Chattanooga Railroad Company, to set aside certain corporate actions based on the vote of the majority of the stock therein held by the Louisville & Nashville Railroad Company. It is thus seen that the particular question with which we are now dealing was presented in that case, and it was there decided. Said Lurton, J., in delivering the opinion of the court:

"That the Louisville & Nashville Railroad Company had the power to acquire, hold, and vote shares in the capital stock of the Nashville, Chattanooga & St. Louis Railway Company cannot be successfully denied. Such a purchase was not in excess of its chartered power, for the express power was conferred by an amendment of its charter granted January 27, 1880. Comity requires that this charter power shall be recognized as valid if not opposed to some law or policy of the State creating the corporation in which stock has been acquired. It is impossible in the present State of Tennessee legislation to say that this charter power is either opposed to any law or policy of that State. Upon the contrary, section 17 of the special charter granted to the Nashville, Chattanooga & St. Louis Railway Company expressly invites such ownership by providing that 'any State or any citizen, corporation or company of this or any other State or country, may subscribe for and hold stock in said company, with all the rights and subject to all the liabilities of any other stockholder.' In addition to this, Acts 1881, c. 9, authorizes all railroad companies, 'existing under the laws of this State, or any other State or States,' to acquire by 'purchase or otherwise, and hold or dispose of, any bonds or shares of the capital stock of any railroad company or companies in any State or States.' This provision does not cover the Louisville & Nashville Railroad Company, which is neither a corporation of this State, nor of this and another State; but it indicates so broad a policy in respect to such

transactions as to forbid the courts from saying that ownership of such shares is contrary to the public policy of this State. The right to own and vote this stock carries with it the right to vote for directors and to vote the stock upon all questions in which the owner has an interest. *Transportation Company* v. *Beatty*, 12 App. Cas., 589; *Gamble* v. *Water Co.*, 123 N. Y., 91, 25 N. T., 201, 9 L. R. A., 527; Beach, Priv. Corp., section 247; Mor., Priv. Corp., section 729.

"That this majority of stock has been used for the purpose of electing a board of directors selected by the majority owners is no cause for complaint. The majority, rather than the minority, are entitled to control, provided that control be not used oppressively, and for the outside and illegal purposes of obtaining unjust advantages at the expense of the legitimate interests of the minority."

An exactly similar question to the one before the court in the present case was decided by this court so far back as 1874, in the case of *Deaderick* v. *Wilson*, 8 Baxt., 108. The bill in that case was filed by certain stockholders, in behalf of themselves and other stockholders, to set aside a sale of the majority of the stock in the East Tennessee, Virginia & Georgia Railroad Company, made by C. M. McGhee and others to the Southern Railway Security Company, a Pennsylvania corporation. The court in dealing with this branch of the case said:

"The charge of facts on which this relief is based is, briefly, as follows:

"That there exists in the United States a combination of capitalists, whose purpose is to make money for themselves by obtaining the control of the great lines of railroads in the Middle and Southern States. That this combination has obtained an act of incorporation by the legislature of Pennsylvania, under the style of the 'Southern Railway . Security Company,' popularly known, says the bill, as "Tom Scott," from the fact that the combination or corporation is controlled and' managed by Thomas A. Scott.

"It is also stated that respondents have an interest in said corporation, owning a large number of shares in the stock of the same. It is then alleged that, in September, 1871, Wilson, McGhee, and Jaques, being officers of the railroad company, owned only 8350 shares of stock in said railroad company, and, intending to purchase the remainder at depreciated rates, did sell and transfer to 'Tom Scott,' or the Southern Railway Security Company, 10,000 shares of the stock of the East Tennessee, Virginia & Georgia Railroad Company, at the price of $100 per share. That 10,000 shares constitute a majority of the stock of said company, and under a certain amendment of the charter, which' is referred to, give control of the company, so as to render the minority's stock worthless, at the option of the holder of a majority of votes or stock.

"How this last ruinous result is reached, or by what process it can be affected, without equally affecting the value of the stock owned by the majority, we are not informed.

"From the fact of this sale to the Southern Security Company, or to Scott, is deduced the conclusion that it is a sale of the railroad to a corporation in a distant State, that is a violation of the sovereignty of the State of Tennessee, of the charter of the road, a perversion of the franchise granted, a transfer of the property of complainants, and is illegal, unconstitutional, inequitable, contrary to public policy, and unconscionable.

"We have given careful thought and attention to this question, and to the able and eloquent argument of counsel in support of it. We are, however, unable, from the facts charged, to see its correctness, or how it can find a legal basis in said facts. The stock must be owned by some one. It is bought and sold in the market as other property of like kind. There is no limitation on the amount which may be owned by any one individual, nor any rule of law or legislative prohibition against another corporation purchasing said stock. Whoever owns a majority of said stock will, under the present charter, have a controlling influence on the election of directors and officers of the company. Whether this be one man or several, a corporation, or an individual, the same result will follow. But when this is done, the officers and directors, as agents of the corporation, have their prescribed duties, and can only act in subordination to and in execution of the powers conferred in the charter, and thus carry out the purposes and objects of the corporation. If they adopt a course in violation of the charter, or in bad faith or fraudlently fail in the

faithful performance of their duties, the courts will give the parties concerned all proper redress. In a word, the officers and directors are, it is true, elected by the holders of a majority of the stock, but, when so elected, are bound to administer and conduct the affairs of the company according to the law of their creation, and under the same duties, obligations, and responsibilities as if elected by the owners of a minority of said stock. In fact, these officers must be elected either by the votes of a majority of the shares of the stock, who have the greater interest in the property, or by that of a minority, if the two stand antagonized to each other, and we see no good reason why the greater should not have the most weight in the management of such institutions, unless prohibited by the charter; certain it is, we can see no good ground on which such control should be given to the minority interest in preference to that of the majority.

"We need not discuss at length the deduction or assumption that the sale of a majority of the shares of stock of a company of this kind is a sale of the railroad, or the corporate property, or its franchise. It is no such thing. The company, the legal entity, owns all the corporate property and franchises it ever owned. The ownership of the stock does not give any title to the capital stock or property owned by the corporation. The two properties are separate and distinct, as we have shown in the previous part of this opinion. How can a sale of the one, then, be a sale of the other? Upon

this theory, a corporation of this character might change or modify its ownership every day in the year by the simple act of transferring the shares of stock in the market by the owners of such stock.

"In a word, we hold that the sale of 10,000 shares of the stock of this company, or of any number whatever, is neither, in law or in fact a transfer of the road, the corporate property, or its franchise; and this portion of the bill, and the argument base upon it, must fail."

The parties entering into the transaction now under examination had the right to rely upon the foregoing decisions, and statutes, as evidence that it was not against the public policy of the State for one corporation to buy the stock of another, where power thereto is expressly conferred in the charter of the purchasing corporation, whether the latter be a domestic or a foreign corporation. If this policy be wrong, relief must be had by recourse to the legislature.

It is insisted that, if such a transaction be in accord with the public policy of the State, then a foreign investing corporation may buy up a controlling interest in all of the corporations of the State. This may be true, except in so far as a monopoly would thereby be created in any line of business, or in so far as there might be an unlawful restraint of trade, or supression of competition between rival companies, and businesses; but the same would be true as to any individual, or syndicate of individuals, having command of very large

capital.    Here again it is observed that preventative means could be enacted by the legislature, and to that body recourse should be had against such result.    The court can only administer the law as it finds it.

It is said that the charter of the American Company is very broad, and that if allowed to operate in this State to its fullest extent, many direful consequences might ensue.    To this we answer that the public policy of the State is declared by the legislature upon this subject in section 2559 of Shannon's Code, when dealing with the power which may be exercised by any foreign corporation admitted to this State, viz:

"If any such charter or articles of association, or any part thereof, filed as aforesaid in the office of the secretary of State, should be in contravention or violation of the laws of this State, all such parts thereof as may be found to be in conflict with the laws of this State shall be null and void."

If the powers of a foreign corporation actually doing business in this State would be so restricted, certainly it would be the duty of the court to permit the operation of foreign charters by comity—no further.

It is insisted there was a consolidation of the several companies referred to, and that the laws upon that subject were not complied with.    This is a mistaken view, to say nothing of the impracticability of such a thing considering the wide separation of the cities in which the several companies operate, and the total want of physical connection, or of common interest.    "While

one corporation by purchasing a majority of the shares of another company may obtain control of the latter, the result, is radically different from a consolidation. In consolidation there is a union of corporate interests and stockholders. In the case of the acquisition of stock, the purchasing corporation becomes merely a stockholder, and the rights of the corporation as such remain unchanged. Control is not consolidation; it is not, strictly speaking, even a conjunction of corporate properties. As said by Mr. Chief Justice Waite, in *Pullman Car Company* v. *Missouri Pacific Railway Co.*: 'Its rights and its powers are those of stockholders only. It is not the corporation in the sense of that term, as applied to the management of the corporate business or the control of the corporate property.' " Noyes on Intercorporate Relations, section 15; *Pullman Car Co.* v. *Missouri Pacific Ry. Co.*, 115 U. S., 596, 597, 6 Sup. Ct., 199; 29 L. Ed., 499. In this connection we quote with approval the following from Harvey on Rights of Minority Stockholders, pp. 44-46:

"The trust obligation formerly resting upon the directors, in their relations with the company and with the stockholders who have elected them to office, is thereafter transferred to the holding company.

"Minority interests still retain every right; and the court will scrutinize 'with earnest, if not severe, vigilance, any pecuniary transactions which may be had between the parties thus circumstanced.'

"Manipulation of the control of a corporation so as.

Clark v. Railroad.

to enable another company to buy in the remaining shares at an inadequate price will not be contenanced by equity; and the bringing of needless suits to waste its property and to destroy its business, with the object of procuring a monopoly for the holding company, will warrant a restraining order, at the request of any stockholder.

"The power to take and permanently to hold shares of the capital stock of another company is not a general right. Unless it is expressly conferred by the charter, or is necessary to carry those powers into effect, the right is deemed withheld; for no corporation obtains any extension of its charter powers by implication. Only the plain terms of its charter can confer those powers, and the right to hold the shares of other companies must be specifically and directly conferred.

"In some instances there is a primary duty to the State that will not permit the control to be transferred in any manner which will relieve the company of the burden of responsibility imposed by its charter. This special rule is most frequently applied in cases of railroads and other corporate bodies possessing special privileges, in return for public service. The element of unlawful restraint of trade will also be considered by the court in reaching its final decision.

"A corporation duly authorized to acquire the permanent ownership of shares in other companies, i. e., a holding company, may lawfully receive those shares and issue its own stock in return.

"It has the right to vote at all meetings of stockholders, receive dividends, and exercise the same privileges as a natural person.

"But the transfer of the control to the holding company must not operate to defraud persons not parties to the agreement, and the rights of the minority will be protected."

The foregoing disposes of all of the contentions pertinent to the controversy raised on the record, as to the first branch of the case.

As to the second branch of the case, this is simply a question of fact, and we need say nothing further upon this head than that an examination of the evidence convinces us that there was no fraud in the purchase of the $1,500,000 of bonds complained of.

We are of the opinion therefore that there was no error in the decree of the chancellor in dismissing the bill, and it will therefore be affirmed, with costs.